And we'll hear counsel in the first of three tandem, not consolidated, cases. The first of which is Deb Paolino v. New York City Department of Education at OWL. Mr. Ashanti? Yes. Good afternoon, Your Honors. May it please the Court. My name is Carl Ashanti, and I represent the appellants in the matters of Mendez v. New York City Department of Education and Paolino v. New York City Department of Education and State Education Department and the appellees in the matter of Carrillo v. New York City Department of Education. The three students in these respective matters, A.C., R.P., and M.G., are all medically fragile, disabled children with severe brain injuries who are nonverbal and nonambulatory. I take it that that may be so, but the three cases are quite different in terms of the way the district courts or the various forums below treated them and the results. That is correct, Your Honor, but there are some commonalities which have brought them together here. And they, all three children, receive special education under the Individuals with Disabilities Education Act, or IDEA, and are simply seeking to attain what they're entitled to under federal law, under what is known as the state provision or pendency provision of the IDEA, 20 U.S.C. section 1415J. The pendency provision grants these three students, like all special education students, with the statutory right to continue to receive what is known as their then-current educational placements pending the outcomes of administrative proceedings their parents filed on their behalf concerning the 18-19 school year. This statutory right is a student's right to pendency. The proceedings their parents initiated on their behalf concern, among other things, whether the New York State Department of Education, or DOE, provided them with a free appropriate public education, also known as a FAPE. The adjudications of their FAPE claims are determinations of their administrative claims on the merits, specifically whether the individualized education programs, or IEPs, that DOE created for them were appropriate to address their individual educational needs. By contrast, because the purpose of pendency is to maintain a student's educational status quo pending the outcome of those FAPE claims, this Court has held that pendency does not concern the merits of an administrative complaint and therefore must be evaluated independently from a related FAPE claim. See DOE v. Eastline Board of Education, 790 F. 3rd, 440 at 453, 2nd Circuit, 2015. In other words, the pendency provision, quote, represents Congress's policy choice that all handicapped children, regardless of whether their case is meritorious or not, are to remain in their current educational placement until the dispute with regard to their placement is ultimately resolved. End quote. Because of this congressional mandate, this Court has described the pendency provision by stating that, quote, this provision is in effect an automatic preliminary injunction. End quote. Zvidee v. Ambach, 694 F. 2nd, 904 at 906, 2nd Circuit, 1982. Mr. Ashanti, if you could help me. Certainly. Try to understand the administrative aspect here. There are at least seven cases pending before this Court, I understand, that involve the same legal issues. Is that right? Many of them do, Your Honor. There might be some variations among a few, but many of them concern the same issue that brought us here. There are at least 16 pending in the Southern District. Is that right? I believe that that's the correct number. Do all of these cases involve a unilateral transfer from the Hope Academy to the Brain Institute? Yes, Your Honor, in that there was the students were all originally at the IHOP school for the 17-18 school year, and then there was a change in location to the I-Brain school year. And there was continuity of a lot of the staff and a lot of — I must say, I don't know how much you have to answer this or how much is in the record. But there's a little strange to see this kind of migration that's going on on Mars that causes all of or results in all of this litigation without quite knowing what's going on. Well, yes, Your Honor. That was really mainly a function of the changes in the management of the IHOP school, but there was a concerted effort made to have continuity, which is why a lot of the staff carried over. A lot of the teachers as well, a lot of the administrators. And so their educational programs were specifically designed to be, you know, continuous and similar to what the students had before, which is why they're entitled to pendency and in keeping with the concerned parents matter. Now, you or your firm represent all of these plaintiffs? We do. You do? We do. And so because of the congressional mandate regarding — Before we get into the big picture, I want to just try to get an understanding of what these cases are about. Sure. To follow up on Judge Sack's question about the migration, what happened that led all of these students to be transferred unilaterally and to file numerous lawsuits while being represented by the same counsel? Well, the DUE is basically taking the position that they are not entitled to pendency, even though each disabled student has a right to pendency under the statute. I understand. I'm just trying to get an understanding, as I think Judge Sack was, as to what is it that happened that would lead to a rather massive migration and then the filing of separate lawsuits. Is there a reason why there wasn't one lawsuit which involved all of them or a class action, perhaps? Or — Well — Go ahead. I'm sorry. Concerning the administrative proceedings, there were different outcomes. And so at various times, there are certain students who were successful at obtaining pendency orders at the IHO level, which — the hearing level. And other times, there were determinations in favor of the DUE, which were later overturned at the SRO level. So that's why there wasn't one class action or lawsuit involving all of them. All right. So let's just go back to the migration itself physically. What is it that happened here? What are the facts that trigger this substantial movement of students in the same direction, from the HOPE Academy to the Brain Institute? Right. Well, I would first point out that it's not specifically relevant to the standard that needs to be applied, but it really just involves a change in the management and the philosophy. And to the point of the IHOPE Academy as it exists today is very different than it did in the 17-18 school year. Back then, it consisted solely of students with brain injuries. And today, it's much, much broader than that. And so there is — there's no evidence in the record that the educational programs that the students received during the 17-18 school year could even have been replicated for the 18-19 school year, despite the fact that it carries the same name. And as a matter of fact, the I-Brain School, as it exists today, is probably more similar to the way IHOPE was than IHOPE is today. Now, the pendency provision on which you're hanging your hat is generally invoked when the school attempts to transfer a student, right? Or to modify the placement, as opposed to — as a defense to the unilateral decision to transfer a child. Am I right or wrong? Well, the pendency provision, it just applies for all students. So it's not — it's not whereas the school district would need to invoke it or the parent needs to invoke it. It's just something that exists as a right that these children have that the DOE has fought against. And the irony of the DOE's position is that currently, it's stating that, you know, the placements — meaning the educational programs were at the IHOPE school, the 17-18 school year, and that that's where these children — But the principle works at least both ways. That is to say, in the Malcolm X case, it was a question of transferring students because the Department of Education shut down the school and they were transferred, rather than their transferring because they saw a reason to transfer. That's correct, Your Honor. And that's the concerned parents case, which actually, you know, was the seminal case, as Chief Judge McMahon held in the Carrillo matter, which established the substantial similarity standard that applies to each of these cases here. Isn't that a question as to whether it applies in the same way coming and going? That is, are the standards the same when it's the school that has — shuts down a program, as it did in the Malcolm X situation, as when a parent says, gee, things are changing. I think I'd better move the child. Is it the same standard? It is, because it — crucially, it relies upon the definition of educational placement. And in concerned parents, as is in the T.Y. case, as also in the T.M. case, as Chief Judge McMahon found, the definition of educational placement for all of the IDA, not just the state provision, but all of the IDA, is educational program, which means it's not tied to a specific location, the bricks and mortar of a physical location of a school, which is the DOE's position. The T.Y. case specifically rejects that definition of a school location being educational placement and instead says that it's an educational program, just as the concerned parents case does, just as T.M. does. And the T.Y. case specifically rejects the notion that it's the bricks and mortar, which is the physical structure of a building, that determines what educational placement is. So what Chief Judge McMahon did, which the court in concerned parents did, which is look to the definition of educational placement, find that it means educational program, and for that reason make the determination that there can be this transfer as long as, which is crucial, there has to be the testament of the substance of the educational program that the student's receiving at the new location has to be similar, substantially similar, to the prior educational program that the student received. And that is the case here. The DOE has not in its papers argued at all that the programs are not similar. They've only argued that the —  Excuse me? The cost. The cost? Well, yes, in that we're talking about the — IHOPE Academy is a non — is a public school — excuse me, a private school, a non-public school, and so is I-BRAIN. So it's — Are you seeking — are the parents seeking something more to pay for I-BRAIN than they were — that they were successful getting paid for I-HOPE? No. And that is not what has ever been at play here. Yes. Your Honor, that is absolutely not the case. They are seeking the tuition that is at I-BRAIN, but they're both non-public schools with, you know, tuition that's, I believe, well over — that's six figures. But it's not — in the DOE's position, they would be funding the I-HOPE school in any event. So it's not a matter of, you know, not saving public expense versus having to expend — There is an aspect of some of these cases that does worry about that and says up to a certain point, you will be reimbursed. And my question is, are you expecting, are you seeking reimbursement with respect to the transfer school that is different from the level of reimbursement that you were getting from the transfer or school? Well, I believe that once the substantial similarity standard created in concerned parents is met, that that is all that needs to be shown by the parent. But to the extent that, you know, if there was any limitation that would be placed on it, given that we are — there are non-public schools involved both in either case, if there was a limitation on the amount of tuition, for instance, that it would have to be tied to what the tuition for the 17-18 school year, you know, certainly the parents would accept that position from the Court. But we don't believe that that is required by the substantial similarity standard. Okay. Mr. Ashanti, you've reserved some time. Yes. We appreciate it. Thank you. Your argument. We'll hear from Mr. Lee. Good afternoon, Your Honors. Eric Lee for the New York City Department of Education. I want to cover three areas that I think will address some of the questions that was exchanged earlier. First, on the pendency provision, Judge Cabranas, you're right. The pendency provision really was designed as a shield for the status quo, not a sword for unilateral moves, what the parents want to do here. The pendency provision doesn't grant a voucher redeemable at the school of the parent's choice because it's trying to preserve the status quo. And the reason why the pendency provision is so focused on preserving the status quo, it's because it's trying to keep the focus on the true underlying substantive dispute issue in all IDEA cases, which is the IEP, not whether a new school that the parents have picked should be the school for pendency purposes. The test that the parents are pushing a theory of portable pendency, which is really an oxymoron. Pendency is supposed to be certain. And the whole reason why this Court has said that pendency is a separate question that is an exception to the exhaustion requirement, because it's relatively straightforward. What was the last educational agreement that the parents had agreed to? In this case, it was IHOPE. In fact, in all of these cases, the parents, there was a litigation at the administrative level, and in many of these cases, an IHO officer said after hearing a year of evidence, we've concluded that the HOPE Academy is the appropriate school. The parents in these situations made no word that they were going to suddenly run to a different school, a brand-new startup school that moved three different times in the first year, was short on several services, most notably in these cases Vision Services. But I'm told by DOE that it was short other services as well. I think it's natural for any school district, big or small, to say this is not how pendency works. The reason why pendency, that provision, comes with a grant of immediate nonrefundable public money is because both sides have agreed this is an appropriate school. In that case, it was IHOPE. And the parents' theory of portable pendency fundamentally goes against a foundational principle of the IDEA. And this is straight from Burlington. This is Burlington commenting on the pendency provision. Parents who unilaterally transfer their child to a new school during the pendency of a fatal litigation, which is what we have here, do so at their own financial risk. This court in DOE v. East Lime doubled down, reaffirmed that principle, and said when a parent rejects a stay-put placement by unilaterally placing the child elsewhere, retroactive reimbursement is available, if at all, only through a fake claim. I want to address, Judge Sack, your question about the substantial similarity test, and there was some suggestion whether this is a goose-gander situation. It's not a goose-gander situation. Substantial similarity, as articulated by this Court in concerned parents, the case is very clear. It's that they are addressing the narrow issue of whether the school has the traditional authority to move a set of children to another school because of the fact that the original school was unavailable due to severe budget cuts. And this Court said a school district can't do that. It's in the same district, same classification, because that respects the traditional authority that the school has under the IDEA. The parents are resting that standard and moving it to the context of a period of time. Is there a circumstance in which that principle would be available to parents, as it were, to all? Yes. And I'm going to — I will address that. But I want to stress that TM forecloses it in the penancy context. And I think TM — you know, parents have really wrapped themselves around TM, but it's really an anaconda that it actually goes for us. And I'll tell you why. In TM, the school district had agreed to a set of penancy services, but then they decided that they no longer wanted to provide that. The parents in that situation then unilaterally moved their child to a private provider, and then they said, because we've made this unilateral move, you need to honor our unilateral move at penancy. This Court said no. This Court said, even though there was good reason, and even though in that case, in TM, the penancy — the penancy services found were identical. So we're not even talking about substantially similar. The parents said, we have found identical service providers who are willing to do this. This Court said no, and it said, quote, it is up to the school district to decide how to provide the educational program. And, you know, the parents are saying the DOE's position is we have to be tied to the bricks and mortar. That's not at all our position, and it's a gross mischaracterization. If I — if the Hope Academy, they were there and it had to move to another building down the block, it was a suitable building, we would have no basis to object. That is Hope Academy. That is the school that not only did both sides agree upon, an IHO officer said this was the appropriate placement. What — If the resolution makes sense, if the services that justified the original placement ceased to be available at the place where it is, and that's not — they simply are no longer given, what are the parents to do? I'm glad you raised that, and that's what I was going to address. This is where — this is the route that the parents could have. Instead of perverting the pendency provision and claiming that they have immediate right to nonrefundable money, under Honig v. DOE, and as recognized in the Fourth Circuit in the Wagner v. Board of Education case, which we cited in our briefs, parents do have an option. They have the option to go to court, ask for a P.I., but they have to, as the Fourth Circuit and the Supreme Court explained, they have to prove up all four factors of preliminary injunction tests. They have to show clear and substantial likelihood of success. They have to show irreparable harm. They have to show your honor. They have to address the court and say, we can't attend school A because it's unsafe, because my child was kicked out. My child is being threatened under physical harm. And then the court has to weigh those four factors. They know they can't win that. That's why under their sort of — sort of cramped version of substantial similarity they've said this here today. They disavow any explanation why these parents moved en masse to the new school. They say it's not important. You just need to know that we moved to a new school, and you have to pay us money immediately. School districts shouldn't be put in that position. Warner v. Board of Education and Honig is very clear. Parents are allowed, because they are the parents of the child, to move their child to a new school. What does not follow is what they want, immediately — immediate nonrefundable taxpayer money. That only comes through, through the IDA administrative process. The reason why it's designed to really test, first of all, is the new school that you've selected actually appropriate for your child? And then under prong three, as this Court is well aware, are there equitable reasons truly to justify the full reimbursement of the tuition. They concede that, that unilateral moves by parents need to be vetted under that system. But they say, listen, in this situation, don't even worry about it. That's going to happen during the parallel fate litigation. That's not how the IDA works. There's no need to create collateral litigation about pendency when it's very crystal clear what pendency is. And I think TM makes very clear that pendency, while it is the educational program — no one's disputing that educational placement means educational program — but it cannot simply be what the parents say it is, and they say, well, it's substantially similar. You don't even need to look at the location, whether it's actually safe for the children. Again, the record of these three cases alone suggests that school districts have good reason to say, we're not comfortable with this. This is a school that is brand new, moving three different times, has a shortage of services, and I think they pitched the idea that their substantial similarity test, sort of a crude version of what was articulated in Concerned Parents, is very easy. But, in fact, it's not. The reason why there has been so much litigation is because in these cases you have IHO officers, SRO officers, and in the Carrillo case, a district court judge looking at the exact same two schools, looking at the exact same population of students and coming to different conclusions about whether this new start-up school is truly substantially similar. I have a question. On Carrillo, what are you asking us literally to do? Are you asking us to vacate and remand it? I think in all of these cases this Court should come out and say, pendency is not what the parents understand it. What are we supposed to then do? It isn't. It's not pendency. What do we do with the case, then? I think in the Mendez case it could be dismissed. I think in the Paulino case it could be affirmed, because in that case the district court — I asked about — In the Carrillo case, I think a vacature and dismissal. I think that's procedural. That's important. So you're saying vacate and dismiss, not vacate and remand, for the Court to do something further? Yes. I believe it just as a matter of law, the principles from Honig, the principles from Concerned Parents and TM make clear that a unilateral move is not at all what the pendency provision endorses. And I want to be clear on this, because the plaintiffs basically suggest, listen, all we want to do is move kids from school A to school B. They don't grapple with the fact that the district courts, in particular Judge Caproni and the Nesky decision, which the parties discussed in the briefs, had said this is a principle that knows no bounds. If you're saying literally kids can move from school to school, as long as you meet this general test, basically, literally a comparison of the IEP on paper and say, well, it looks substantially similar, it's, you know, okay, they're missing a couple of services, we're going to just move this — allow you to move this kid to this school, even though the litigation involving the actual substance — the substance of the IEP is still in dispute. She says that allows parents then to say, I want to move my kid out of public school and move him to a private school because it's substantially similar, and vice versa for a school district to say, that's great, you're going to the public school, but we now want to move you back into the system because, look, it's substantially similar. That is a system of chaos for the IDEA and specifically for the pendency provision in general. Let me follow up, if I may, with respect to the line of question of Judge Sack. Yes. You're arguing these general principles with respect to each of these three cases, right? That's correct. Let's just go in a very mechanical way, if we may. Let's begin with De Paulino. Yes. What decree do you want from us in De Paulino? What's the decreed language? I believe in — I'm trying to get also the particular procedural postures of the case. I think in that case — That's exactly why I'm asking the question, because they're in different procedural — Right. I think in that case, Judge Daniels dismissed the complaint, so I think it's an affirmance and a dismiss — an affirmance of his decision to dismiss the complaint, and he recognized, as a matter of law, pendency is not what parents understand it to be. In the Mendez case, that — I believe the — Why don't we go to Carrillo next? Oh, sure. I believe in that case, Judge McMahon basically reviewed the IHO officer's decision anew, and she said pendency is out of hope. I think there needs to be — She said what? She said pendency is at the new school, the brain — Huh? My brain. Correct, right. And I think that — there needs to be a reversal there and an instruction to dismiss the complaint, because, again, it's based on the same theory. They're based on this theory that they can go from school to school to school as long as they show it's substantially small. So it's not vacate, or you would have us in Carrillo, we would reverse outright, which would mean effectively the dismissal of that action. Yes, I believe that's right. Okay. And then on Mendez, Mendez is interesting because that's technically an appeal of a refusal to sign an order to show cause. That's actually jurisdictionally, frankly, defective, and I think a different panel of this court in the Mazuda case simply dismissed it for lack of jurisdiction. Was it a summary order? That was a summary order. I do want, in my one minute, to address two things. So on Mendez, you would have a simply — what would be the decreed language there? We would be affirming the dismissal? No, no, we would be vacating. We'd be dismissing the appeal. I think you'd be dismissing the appeal for lack of jurisdiction. Dismissing the appeal for lack of jurisdiction. Right. I wanted to address two things. One is there was a question about costs and whether the costs are the same. My understanding from DOE is actually the costs are significantly higher for the children to attend the new school. My understanding is it's not necessarily strictly based on tuition. They don't really have the dollars and cents on that. My understanding, it's more expensive because when the children were attending Hope Academy, the DOE actually arranged for transportation. And when the school district is able to arrange for the transportation, there's cost savings, naturally. And, in fact, we like that. We encourage that to happen. With Brain Institute, what the kids are doing is all of them, my understanding is, they disavowed the DOE public transportation and they've gone with a transportation company that's tied with the school. So now you'll see in several of these cases, I think even in the Carrillo case, there's sort of a discussion of, okay, now you're going to the new school. Now the parents are also saying, well, we want these services as well because of the fact that the kid is going to the new school, which is creating satellite issue off of a satellite issue. And that's why I think it's not accurate to say that the costs are somewhat of a wash. And, frankly, in the TM decision, which I think Your Honor was alluding to, the Court was very clear that in that case it was because of the fact that the DOE, Cornwall School District, had refused, basically. And so there was an understanding that for one year they could pay for the costs. But going forward, the parents would have to either put the kid back with the public school system or they would have to take on, as this Court said, take on that unilateral financial risk of providing for that child. I see my time is up. Thank you. Thank you. Attorney Greenwald wishes to be heard. Good afternoon, and may it please the Court, Blair Greenwald on behalf of the State Education Department, solely in the DiPaolino case. The State agency appears here simply to address the district court's ruling that the State agency is not a proper party, which this Court may affirm on either of two independent grounds. First, it is undisputed that the parent did not challenge the — that ruling in her opening brief on appeal, and therefore has waived any such challenge. But even if there were no waiver, the State agency is an improper party here because the parent failed to state a cognizable cause of action against the State agency in this suit for pendency funding. The parties do not dispute that it is the city, not the State agency, that is responsible for any pendency funding here. In addition, the complaint also does not support the parent's claim for a declaratory judgment that the State agency is vicariously liable for a deprivation of the child's pendency rights. The complaint's only allegation pertaining to the State agency is that the State agency certified Mr. Briglio to serve — to be eligible to serve as an impartial hearing officer. This is in DiPaolino alone? Yes, Your Honor. But Federal and State regulations — You're not in the other ones, and you're expressing no view on the other two. That is correct, Your Honor. And the decreto language that you seek from us with respect to DiPaolino is simply dismissal? To affirm the dismissal of the State agency as an improper party, yes, because the — the complaint has failed to state a cognizable cause of action against the State agency. If the Court has no further questions, we would ask that they — the Court affirm on that basis. Thank you. Your Honor, if I may. Mr. Tranti, please. Thank you. The DOE's interpretation of TM is just simply wrong. TM was decided based upon the public-private dichotomy that existed. There was an offer from the district to directly provide pendency services, as was its obligation, and it failed, and the parents rejected that offer. So the parents, instead of accepting the pendency services that the district was offering, went to a private institution instead. And the Court found that it was that public expense for the private institution that it would not allow where there was an offer for these pendency services. Here, there was no offer for pendency services for any of these three children. The DOE is seeking to argue that there was no — there was a rejection of the placement is the educational program. So instead of a rejection of the placement, there was an adoption of the placement by making sure that at the Ibram School, these students have had the same or substantially similar educational programs. The substance of their educations was the same, and that's why there was no rejection of the educational placement. They're playing on words with the use of the word placement, and at times — and they're saying that it's a school. So if the I hope school moved, that would be no problem because it would be the same school. Well, it's — placement doesn't mean school. It means educational program, as this Court has found not only in the concerned parents, but also in T.Y. and in T.M. as well. And as I mentioned, T.M. was decided based upon the fact that there was this public-private dichotomy that doesn't exist here. Why? Because both I hope and Ibram are both nonpublic schools. The only thing that the district ever offered — and the district mentioned the IEPs. In the IEPs, those were public school placements that were offered in the IEPs, and it had nothing to do with penancy. They were offering these public schools that do not match up with the basis for penancy for any of these children. The basis for penancies for these children was the educational program that they had in the 17-18 school year, which was at a nonpublic school. So the district cannot shoehorn that to say, oh, well, we offered penancy. They did not. And it's also a fallacy to say that they were not on notice of the fact that these students were going to I-BRAIN because there was a 10-day notice in each of these cases. So they knew that these students were going to go to I-BRAIN, and still they made no effort to offer penancy services for them. I probably should have asked your answer, but supposing — and this is not meant to telegraph anything — but supposing you were to lose these appeals, would you then be able to go and seek a — you know, start a new proceeding involving seeking reimbursement for the — for the I-BRAIN, as though it hadn't — these students had never been — No, Your Honor. And the district knows that, which is why they've taken the position that, oh, if they had — Why? Why? Because it's for the 18-19 school year, and that's — and that's in the past. How about 19 — the next year, 19 — Right. Well, there are separate proceedings involving those at the administrative level. Well, technically, each one is a separate proceeding. Is that right? Correct. Each school year is valued differently. But you would be able to seek to go back to 19 for whatever you're up to now, 2021. You're not forever cut off from the possibility of getting an order which contemplates reimbursement in future years. This doesn't stop you from seeking it for future years. Yes. That depends on the outcomes of proceedings that are going on now and then in the future. But it does not depend on what we do here today unless we say something broader than necessary, perhaps. That is correct. But what's important about what Your Honors do here today is — is to not depart from concerned parents, because what the district is arguing is that there should be — in essence, back then, in 1980, when concerned parents was decided, they took the position that the educational placement means educational program. And here, today, before you, they're taking the opposite position. I just want to make it clear. I don't doubt that that's the position you're taking and that's what we're dealing with today. I'm trying to figure out what impact, what further impact what we do today has on your clients. And that's all I'm trying to do. Certainly. That would deprive them of their statutory right dependency. But it would not necessarily deprive them in future years of having a FAPE and reimbursement according to the FAPE. For future years, no. But for here, the 1819 school year — I understand. I'm not — I'm not saying, oh, it doesn't matter what we're doing here because you can always get in the future. That's not what I'm saying. I'm just asking whether it isn't true that we do it year — as you said, we do it year by year. And this involves present maybe and certainly past years and whether it continues under those stay-in-place rules. But we're not prejudging in any way what happens. But it would have ramifications to a certain extent because currently students who are at I-BRAIN would also then, seeking penancy currently, are seeking penancy by means of the Concerned Parents' Substance Disorder Standard with a So, Your Honors, you know, that would be a foreclosure of 1920 to a certain extent as well. But what's important to note is that there was no offer of penancy services by the district. The district is — and actually the district fought against, I hope, being determined to be the placement for these students during the 1718 school year, and now they're taking the opposite position. Just like with Concerned Parents, then they — they argued successfully that educational placement means educational program, and it's not tied to a particular location, but here they're arguing the opposite. So what they're arguing for really is for there to be a double standard in place. For — under the IDA, for the words educational placement to mean educational program only when it's invoked by a school district, but for it to mean school location when it's invoked by a parent. That makes no sense. That's not what the Court found in either TM, Concerned Parents, or TY, or any of the — of its precedents. And that's not what is called for, given the fact that there is only one definition for placement, and that means educational program. And — Let me ask Judge Sack's question in a slightly different direction, which is, would it have been possible — would it have been possible for the parents to proceed otherwise, rather than by making the unilateral move to seek approval for the move? Would it have been possible to proceed otherwise and possibly secure funding at Offer Eye Brain rather than — than I hope? It would not have been, because, as I mentioned before, the facts of this case that the record establishes is that there was no offer for pendency services, and it's the district obligation to provide that. As TM and other cases have found, it is their — and Doe v. Eastline Board of Education as well, that it's an offer of pendency services that's the board — that's the district's obligation that they fail to do, even though they received a 10-day notice and noticed that the students would be attending Eye Brain. So in the absence of that, in that void that was left, knowing that these students are entitled to pendency, their parents sought pendency at the Eye Brain program. But the district, rather than ever offering pendency services at the time, instead, ex post facto is saying, oh, you misstepped, because even though we didn't offer pendency services, you shouldn't have gone to Eye Brain. Despite the clear law of this circuit in TM and TY and concerned parents that educational program means — I hope was no longer offering — was no longer doing what qualified it for being pendency services. Correct. I mean, there — in the record, there is no evidence to suggest that the Eye Hope Academy as it exists today — and that's not the standard that has to be met, because there could possibly be more than one institution that could provide the services that a student — has been established as the student's pendency placement. But there's been no evidence brought forth by the district to show that these educational programs that were established in the 17-18 school year could also be fulfilled at Eye Hope during the 18-19 school year. No procedure by which you could go to court or any other place to say that Eye Hope is no longer offering the services that justified its prior placement and seeking an injunction or whatever to require that this be transferred to Eye Brain? I'm sorry? Seeking an injunction or some kind of a forward-looking order, as opposed to backward-looking after the fact, to get Eye Brain designated in place of Eye Hope, where Eye Hope is no longer doing what's required. Right. Well, we are in 2020, but these cases were brought in during the 18-19 school year, so they were — and the district mentioned — I'm saying, if you — at the time, when it was still possible looking forward, there was nothing that you could do? Well, yes, in terms — well, the Eye Hope, as an institution for penancy, was never offered. So there was never an option for — by the district. It was never offered. So it was never an option for the parents. I don't think it's penancy. Maybe I'm wrong, and I think you'll surely correct me. But the issue is whether back when it happened, when it turned out that Eye Hope was no longer an appropriate place, was not doing its job, not doing the job that the parents needed to be done for their children. If there was something that could be done at that time legally, not penancy, not move the children and say, I'm entitled to it, but go into court and say that we were put in — our children were essentially placed in Eye Hope. It's not doing the job. We need an order of the court or the DOA. Then they go and say, we need — forget penancy for just one second. Certainly. Could they not have gone in and said, give me an order to put me in another school? We have Eye Brain, for example. Right. Well, that's exactly what they did in the administrative proceedings. DOE is seeking to make — to paint a picture that there is additional litigation that there shouldn't be. No. There are these FAPE proceedings that were there from the very beginning. When these parents filed the administrative due process complaints on behalf of these children, it was on the FAPE claim and for penancy. And so the adjudications of the merits of the FAPE claims were all already going on. So it's — and penancy — I'm sorry? Well, there are different outcomes. With respect to the Garzon matter, there was an unfavorable determination in favor of the district, and that is being — we're intending to appeal that. There was — with respect to Paulino, there was a determination in favor of the parent, and the district lost that appeal. And — The parent in that case is getting — its position now is better because it won that appeal. I'm sorry. I misspoke. In Calderon. That was in Calderon. Yes. And that is — they're in a better position now. So — but those proceedings were always going on. And the point being, penancy is an interim relief. It's a procedural right for interim relief. So it's only good — it's only valid, effective, as long as the administrative proceedings are ongoing. What we're dealing with here is interim relief. We're not dealing with the other relief that you have sought or the lawyers have sought on behalf of these parents in order to get them a fair and appropriate education. Correct. And so all the references by the district of, well, is this place appropriate, basically saying, is it properly vetted, that is — the courts have said, that is for the FAPE proceeding, which is not with regard to the merits. Any question as to whether I-Brain was appropriate is a question about the merits, which this Court has found explicitly is not for penancy. It's for the determination of the FAPE claims. Mr. Ashanti, I don't want to keep going around on the same point. I've given you some extra time, a good deal of extra time, but I want to wrap up by asking some simple questions. The New York State Education Department, Ms. Greenwald, has indicated that she seeks a very simple order from our Court. Do you object to an affirmance of the dismissal of the State as an improper party? Well, the State is interesting in that it's — the fact that it's — it controls the speed at which these — the judications are held. You think the State is an appropriate party, is a proper party? Yes, Your Honor. Because its actions or inaction does affect penancy in that sense. It does affect it because the adjudication of the underlying proceedings, you know, can be — to the extent that there's the dearth of IHOs to hear these cases, which there have been, and the SED is responsible for that, they are responsible for the process. And it's the process that has been failing these children. Okay. Now, you made a reference to Garzón before. Garzón is one of the indicated parties in Carrillo and Garzón against New York City Department of Education. You suggested that Garzón had not yet been determined. Is Garzón before us now? Is that a proper party? Garzón is Carrillo. They're the same. They're one and the same. They're — Right. Okay. They're one and the same, Your Honor. José Garzón is in the same case as Mariana Carrillo. Carrillo. Carrillo. Fine. Okay, fine. Thank you. Mr. Lee has reserved one minute. Very quickly, Your Honor, I want to address the questions that were posed by the judges. First of all, on the TM public-private distinction, I think we very adequately addressed that in our briefs. That was not at all an issue. The Court said very specifically it is up to the school district to determine what that is. It did not at all hinge on that. And, in fact, as we mentioned in the reply briefs, this Court said specifically school districts can provide their — can meet their burden through both a private placement — private services or public. The second is I want to address the questions I think were being posed, which is could there have been other options? Yes. In fact — So what should the parents have done if — you say the parents could not unilaterally move the child from hope to brain and say this is — this is — dependency has now changed from hope to brain. Right. What should they have done? Yes. They have — they have three options. And, first of all, of course they can unilaterally move it. What they want is the immediate nonrefundable funding. So, first of all, they could have — as the system is set up for it, the unilateral placements are litigated at the faith level. So, for example, for the 2018-2019 school year, you have a parent who has moved a child from school A to school B. They bring the faith claim. They say, school district, your proposed faith was terrible. We think you should pay for school B. Guess what? That litigation happens if the parent wins and the school district doesn't appeal, or even if they appeal and the SRO affirms, they get money for that school district. What they wanted to do here is a classic game of heads we win, tails we lose. They wanted to run to court and say, listen, don't even care about whether school B is actually appropriate. Just look at the papers. Look at — look — look. It's the same thing. Pay for it now. Two more. Yes. They have two more options. The second option is dependency is — could be determined by mutual agreement by both parties. They could have said, listen, we are moving these children en masse to this new school. Here are the reasons why we're doing so. We think it's urgent. We think there's irreparable harm. Please work with us and recognize — recognize this new school. Guess what? The DOE does that. If a parent comes to the DOE and says, my child was kicked out of this school, we can't go back to that school, or this building is unsafe, or whatever the reason is, DOE works with parents to say, we recognize that. Pendency — the transfer of pendency would be agreed under this — Mutually agreement, correct. — as opposed to done unilaterally. As opposed to done unilaterally, creating all of this unnecessary litigation. Here's the third route. The third route is specifically endorsed by the Supreme Court in Honig v. Doe and endorsed by the Fourth Circuit in Warner v. Board of Education. We cited these cases repeatedly. They never once refuted this, and they know it. What is it? That option is bringing a P.I. Like, this is what happened in Warner. They bring a — in the Fourth Circuit case, they bring a P.I. They have to meet a preliminary injunction motion. Preliminary injunction. Yes. They have to meet all four standards, and the Fourth Circuit is clear on this. They said, you have to — if you're going to change the placement, if you're going to say, we don't want that to be — we want now a new school to be the educational placement, you have to meet all four standards, and you have to show that you're likely to show that this is an adequate program for the child. And you have to show irreparable harm. You — my opposing counsel was asked repeatedly, why did you guys move? Why was it necessary to do so? He has repeatedly disavowed giving you an answer, and his answer has been, well, there's been no evidence that Hope Academy could have been appropriate for this child. That's not the right question. The right question is, why did you move your child from a school that everybody a month ago said this was appropriate? In fact, you were fighting tooth and nail to get funding there. DOE agreed. That's the question. They can move unilaterally and then claim the — Well, they certainly can't do that, but I'm — That's not what the question is for us. Yeah, that is. I'm just saying they could have. They could have come to the court and teed up a true preliminary injunction motion and say, here are the reasons why we're moving. Here is the reason why there is irreparable harm. That's your response to Judge LaValle's question, or one of the answers. That is, they could have moved proactively or initially before they moved. Correct. And asked for funding for their move. They could have sought preliminary relief of some kind. And importantly, as the Warner case explains, citing Honig, analyzing that, saying, you need to show all four factors because Honig is very clear. The pendency revision is a — The answer to Judge Kibana's question is yes. Yes. Does it have to be before moving? I mean, supposing that it is as the school year begins at School A, Hope. Right. As the school year begins, they become aware that the school is no longer satisfactorily performing what was the basis for finding it the subject of the FAPE. Right. And so what do they do at that point? Their child is simply not getting what the child needs. Right. And what the pendency, as you define it, what the pendency provides is no longer satisfactory. Right. So do they — as these proceedings go on, the year passes and the child is not getting the services. Well, again, the parent is always entitled to move their child out of the school. So if they truly believe that School A is completely inappropriate for their — they can remove it. They can then ask for that preliminary — I think that's exactly what happened in Warner. The parents first removed their child to this new school, then brought the preliminary injunction motion, and the court said, well, the district court error is failing to truly analyze all four factors. And the court said, we accept that parents can do this. What is inappropriate is this idea that they get automatic nonrefundable money when they've unilaterally rejected what was the pendency placement. And the last point, I think this is important. FBI doesn't need to be sought prior to the move. No. It should be sought promptly. Promptly. Exactly. And this is the important thing. And it comes back to sort of their accusation that we are somehow imposing a double standard or misunderstanding concerned parents. I think this court understands that case and knows how that case was applied in TM. There's no double standard here. It was a completely different question. It was not on pendency. It was about a school district's ability. And the reason why the school district and the parents are situated differently is because the school district always has an obligation under the IDA to provide an education and an educational placement. Parents can choose to move their child, if they so wish, on their own whim from school to school to school. What they do not get is funding that follows them like a voucher. And unless this Court has any other questions. Rule reserve decision. We're adjourned. Thank you. Court is adjourned.